UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JOSE E. PAULINO,                      :

                Petitioner,           :    02 Civ. 2735 (DAB)(HBP)

     -against-                        :    REPORT AND
                                           RECOMMENDATION
MICHAEL A. ZENK, Warden, FCI          :
Allenwood and THE PEOPLE OF THE
STATE OF NEW YORK                     :

                Respondents.          :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE DEBORAH A. BATTS, United States

District Judge,


I.  Introduction


          Petitioner Jose E. Paulino seeks, by his pro se peti-

tion for a writ of habeas corpus under 28 U.S.C. § 2254, an order

vacating a judgment of conviction entered on October 28, 1998 by

the New York State Supreme Court, New York County (Tejada, J.),

convicting him of unlawful imprisonment in the first degree and

criminal possession of a weapon in the fourth degree in violation

of New York Penal Law Sections 135.10 and 265.01, respectively.

Petitioner was sentenced as a second felony offender to an

indeterminate term of two to four years on the unlawful imprison-

ment count and a concurrent determinate term of one year on the weapons count. Petitioner has completed serving his sentence.

For the reasons set forth below, I respectfully recommend that the petition be denied.

## II. Facts

### A. Facts Leading to Petitioner's Conviction

Prior to his conviction, petitioner lived with his sister, Angelica Paulino ("Angelica"),[1] in an apartment on the fourth floor of a multi-story residential building in the Washington Heights section of New York City (Tr. at 66, 184-85, 198-99, 214).[2] The building had a fire escape close to the middle of the building (Tr. at 214). Angelica's two children also lived in the apartment (Tr. at 200-01). The apartment was approximately twenty-four feet down the hall and across from their mother's apartment (Tr. at 187-88, 246). The mother, Asuncion Polanco ("Asuncion"), lived with her daughter -- petitioner's other sister -- Penelope Paulino ("Penelope") (Tr. at 186, 244-45).

---

[1]Most of the witnesses who testified at trial were petitioner's relatives. For simplicity, they will be referred to by their first names.

[2]"Tr." refers to the transcripts of petitioner's trial provided to the court by respondents.

2

On the evening of March 28, 1998, petitioner and Angelica had a verbal altercation and the police were called (Tr. at 201-02, 272). The police and petitioner left, and Angelica double locked and chained her door (Tr. at 273-74). Angelica told her mother that she did not want petitioner to stay in her apartment any more (Tr. at 314). Some time between midnight and 2:00 a.m. on March 29, petitioner unlocked the apartment door with his keys and broke the chain to gain entry to the apartment (Tr. at 189, 315). Martin Nunez ("Nunez"), Angelica's boyfriend, was in the apartment's living room and saw petitioner enter the apartment (Tr. at 183-84, 189). Angelica was in the bathroom at the time (Tr. at 201).[3] Immediately after entering the apartment, petitioner proceeded to his room and came out holding a machete (Tr. at 189-90, 278).

Petitioner walked towards Angelica's bedroom and confronted Nunez. Petitioner told Nunez to move, raised the machete in the air and moved it downwards -- about an eighth of a swing -- towards Nunez between one and three times (Tr. at 190-92, 208-09). Meanwhile, Angelica exited the bathroom and dialed 911 on the telephone in her bedroom (Tr. at 201, 276). Nunez

---

[3]Some of these facts are contradicted by Angelica. She testified that petitioner tried to enter the apartment twice. The first time, petitioner saw the chain was up, closed the door and left. Angelica testified that she then went to bed and was awoken when she heard her front door being broken open. She did not see the door being broken open, but heard petitioner's voice immediately thereafter (Tr. at 275-76).

closed Angelica's bedroom door and then left to go get help from Asuncion, hoping she could calm petitioner down. Nunez did not close the front door of the apartment (Tr. at 194-95).

Petitioner then entered Angelica's bedroom with the machete, approached Angelica and, after petitioner realized that she had dialed 911, swung the machete and cut the cord that ran from the telephone to the wall while the handset was still in Angelica's hand. The cut was close to the base of the telephone, less than a foot away from Angelica (Tr. at 278-79, 292-93, 328). Petitioner then stated "I am going to kill you," swung the machete again and hit the night stand close to where Angelica was standing (Tr. at 281-82, 296-97). Petitioner then swung the machete a third time, hitting, but not damaging, a mirror (Tr. at 297). Angelica begged petitioner not to kill her and offered to gather her clothes and leave the apartment. Petitioner replied that if Angelica put her hands near her clothes, he would chop them off (Tr. at 300-01). Petitioner never struck Angelica (Tr. at 311).

In an effort to calm petitioner down, Angelica told him that her daughters were sleeping in another bedroom -- even though they were not actually there -- and that he was going to wake them up. After this, petitioner stepped away from Angelica and did not approach her again. The doorbell rang and Angelica told petitioner that she heard their mother knocking and that

4

petitioner should go answer the door (Tr. at 281-83, 300-02). Petitioner went to the door and Angelica then left the apartment by way of the fire escape. While Angelica was trying to exit the apartment, petitioner took a few steps towards her but then turned around and went back to the front door (Tr. at 302-03).

Before going down the fire escape, Angelica saw that a ladder left inside her apartment by the building's superintendent was placed "across" the apartment's front door, seemingly blocking it. She testified that the ladder could not have been across her door at the time petitioner entered the apartment because its position made it impossible to open the door (Tr. at 342).

Angelica then climbed down the fire escape and was helped onto the street by passersby (Tr. at 304-05).

While this was occurring, Nunez returned to Angelica's apartment with Asuncion. Nunez testified that Asuncion "desperate[ly]" knocked on the front door, but she could not enter the apartment because it was locked (Tr. at 195-96). Asuncion, however, testified that she conversed with Nunez in her own apartment and did not go outside until after the police had arrived (Tr. at 255-57).[4]

---

[4]Some of Asuncion's testimony is also contradicted by other witnesses. For example, a police officer testified that Angelica was excited, yelling and flailing her arms when she returned to the apartment while Asuncion testified that Angelica looked "normal" and was not crying or shouting when she returned (Tr. at 221, 258-59). Asuncion also testified that it was impossible to
(continued...)

When the police arrived, Angelica was already on the
street, outside the front door to the building (Tr. at 218-19,
334). Police officers escorted her back up to the apartment and
found petitioner inside. The officers escorted petitioner into
the hallway outside the apartment to prevent a further altera-
tion between him and his sister (Tr. at 221). Inside Angelica's
bedroom, the police observed a phone on top of a wooden night
stand. The phone line had been severed and there was a deep cut
in the night stand (Tr. at 223, 234-36). The police then ar-
rested petitioner (Tr. at 227).

The jury found petitioner guilty of unlawful imprison-
ment in the first degree and criminal possession of a weapon in
the fourth degree. The jury acquitted petitioner of another
count -- attempted assault in the second degree -- and were
unable to reach a verdict on two other counts -- reckless endan-
germent in the first degree and menacing in the second degree.
As noted above, petitioner was sentenced as a second felony
offender to an indeterminate term of two to four years for the
unlawful imprisonment count and a concurrent determinate term of

---

[4](...continued)
hear any noise -- including a scream -- between her's and
Angelica's apartments and that she did not hear any shouting
until after the police arrived. Penelope testified that she had
been asleep in Asuncion's apartment and was awoken by voices and
screams coming from the hallway and Angelica's apartment prior to
the police arriving (Tr. at 246-51, 257, 259).

one year on the weapons count (Transcript of Sentencing Hearing at 7-8).

Petitioner served his sentence and completed his parole on March 23, 2002 (Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 ("Pet. Memo."), Docket Item 7, at 1). Petitioner was then deported to his native country, the Dominican Republic (December 20, 2004 Letter from Jose E. Paulino to the Honorable Henry B. Pitman).

B. Procedural History

Petitioner, assisted by counsel, appealed his conviction to the Appellate Division of the New York State Supreme Court. Counsel argued that: (1) the Trial Court erred in excusing all prospective jurors who claimed they could not serve for two days because of the Jewish holidays (Brief for the Defendant-Appellant ("App. Div. Brief"), annexed to Declaration of Darian B. Taylor, Esq., in Opposition to Petition for a Writ of Habeas Corpus, dated December 8, 2003 ("Taylor Decl."), Docket Item 10, as Exhibit A, at 9-13); (2) the conviction for unlawful imprisonment in the first degree was against the weight of the evidence and should be vacated (App. Div. Brief at 14-22); (3) petitioner was denied effective assistance of counsel (App. Div. Brief at 23-30); (4) the Trial Court erred in ruling that the prosecutrix could question petitioner about his prior criminal

7

convictions (App. Div. Brief at 31-35) and (5) petitioner's sentence was excessive and should be reduced in the interest of justice (App. Div. Brief at 36-39).

Petitioner also submitted a <u>pro</u> <u>se</u> supplemental brief to the Appellate Division. In that brief, petitioner argued that: (1) his trial counsel was ineffective for not re-cross examining Angelica and that counsel's failure to re-cross was a violation of the Sixth Amendment and due process under the Fourteenth Amendment and (2) his rights under the Vienna Convention and Constitution were violated because he was not informed of his right to consult with his country's consular officers at the time of his arrest (Pro Se Supplemental Brief From the Defendant-Appellant, annexed to Taylor Decl. as Exhibit B, at 3-7).

The Appellate Division affirmed petitioner's conviction, rejecting all of the arguments raised in petitioner's counsel's brief but without expressly addressing petitioner's <u>pro</u> <u>se</u> supplemental brief. <u>People v. Paulino</u>, 287 A.D.2d 302, 302, 731 N.Y.S.2d 152, 152-53 (1st Dep't 2001).

The New York Court of Appeals denied petitioner leave to appeal. <u>People v. Paulino</u>, 97 N.Y.2d 686, 764 N.E.2d 406, 738 N.Y.S.2d 302 (2001). Petitioner's motion for reconsideration of the decision denying his appeal was also denied without opinion.

People v. Paulino, 98 N.Y.2d 639, 771 N.E.2d 841, 744 N.Y.S.2d 768 (2002).

Thereafter, petitioner moved to vacate the convictions on substantially the same grounds he asserted in his pro se brief to the Appellate Division (Motion Pursuant to C.P.L. § 440.10 1(g)(h) and § 440.30, annexed to Taylor Decl. as Exhibit I). The motion was denied (March 20, 2002 Order of the Honorable Charles J. Tejada, New York State Supreme Court Justice, annexed to Taylor Decl. as Exhibit K), and the Appellate Division denied leave to appeal (Certificate Denying Leave, dated May 30, 2002, annexed to Taylor Decl. as Exhibit M).

Next, petitioner applied to the Appellate Division for permission to apply for a writ of error coram nobis after affirmance of the conviction, claiming that his appellate counsel was ineffective because, inter alia, she failed to argue that petitioner's trial counsel was ineffective for not re-cross examining Angelica (Petition to Appellate Court for Permission to Apply for Writ of Error Coram Nobis After Affirmance of Conviction, annexed to Taylor Decl. as Exhibit N). The Appellate Division denied the writ, People v. Paulino, 301 A.D.2d 1024, 755 N.Y.S.2d 691 (1st Dep't 2003), and the Court of Appeals denied leave to appeal (Certificate Denying Leave, dated May 16, 2003, annexed to Taylor Decl. as Exhibit Q).

Petitioner filed the present petition for a writ of habeas corpus on April 9, 2002.

## C.  Petitioner's Claims

Petitioner raises four arguments in his habeas corpus petition:  (1) trial counsel was ineffective because he failed to re-cross examine the prosecution's key witness after the prosecutrix's re-direct examination brought out new material facts; (2) his due process, equal protection and confrontation clause rights were violated because trial counsel failed to re-cross examine the prosecution's key witness and properly cross-examine all the witnesses (Pet. Memo. at 2-8); (3) his rights under the Vienna Convention were violated when the arresting police officers failed to inform petitioner of his right to communicate with his country's consulate (Pet. Memo. at 8-12) and (4) he received ineffective assistance of appellate counsel because appellate counsel failed to raise the first other three claims petitioner brings here (Pet. Memo. at 13-21).

Respondents concede that petitioner's petition is timely and that his claims are exhausted (Respondents' Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp. Memo."), Docket Item 11, at 9).

III.  <u>Analysis</u>

A.  <u>Standard of Review</u>

Where the state court has addressed a habeas peti-
tioner's claims on the merits, a habeas petitioner must meet a
stringent standard before a federal court can issue the writ.
Specifically, 28 U.S.C. § 2254(d) provides that in such a situa-
tion, habeas relief may be granted only when the Trial Court's
decision

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly estab-
> lished Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unrea-
> sonable determination of the facts in light of the
> evidence presented in the State court proceeding.

The Supreme Court has explained the alternative stan-
dards contained in the former paragraph as follows:

> First, we have explained that a decision by a
> state court is "contrary to" our clearly established
> law if it "applies a rule that contradicts the govern-
> ing law set forth in our cases" or if it "confronts a
> set of facts that are materially indistinguishable from
> a decision of this Court and nevertheless arrives at a
> result different from our precedent."  <u>Williams v.
> Taylor</u>, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146
> L.Ed.2d 389 (2000).  See also <u>Early v. Packer</u>, 537 U.S.
> 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (<u>per
> curiam</u>). . . .
>
> Second, respondent can satisfy § 2254(d) if he can
> demonstrate that the [State] Court's decision involved
> an "unreasonable application" of clearly established
> law.  As we have explained:

"[A] federal habeas court may not issue the writ
simply because that court concludes in its inde-
pendent judgment that the state-court decision
applied [a Supreme Court case] incorrectly. See
Bell v. Cone, 535 U.S. 685, 698-699, 122 S.Ct.
1843, 152 L.Ed.2d 914 (2002); Williams, supra, at
411, 120 S.Ct. 1495. Rather, it is the habeas
applicant's burden to show that the state court
applied [that case] to the facts of his case in an
objectively unreasonable manner."

Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct.
357, 154 L.Ed.2d 279 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Brown v.
Payton, 125 S.Ct. 1432, 1438 (2005); see also Lockyer v. Andrade,
538 U.S. 63, 70-72 (2003); Brown v. Artuz, 283 F.3d 492, 500-01
(2d Cir. 2002).

In addition to the definition of "unreasonable applica-
tion" set forth above, a state court may unreasonably apply
Supreme Court precedent "if the state court unreasonably extends
a legal rule established by the Supreme Court or if it unreason-
ably fails to extend a legal rule to a context in which the rule
reasonably should apply." Serrano v. Fischer, 412 F.3d 292, 296-
97 (2d Cir. 2005), petition for cert. filed, No. 05-7930 (Aug.
17, 2005).

"Unreasonableness is determined by an 'objective'
standard." Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir.
2005), quoting Williams v. Taylor, 529 U.S. 362, 409 (2000). In
order for a state court's application of Supreme Court precedent
to be unreasonable, "[s]ome increment of incorrectness beyond

error" is required. <u>Henry v. Poole</u>, 409 F.3d 48, 68 (2d Cir.
2005) (internal quotation marks omitted); <u>accord</u> <u>Brown v. Artuz</u>,
<u>supra</u>, 283 F.3d at 500-01; <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d
Cir. 2001). However, "the increment need not be great; otherwise
habeas relief would be limited to state court decision 'so far
off the mark as to suggest judicial incompetence.'" <u>Francis S.
v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000), <u>quoting</u> <u>Matteo v.
Superintendent, SCI Albion</u>, 171 F.3d 877, 889 (3d Cir. 1999) (<u>en
banc</u>); <u>accord</u> <u>Gersten v. Senkowski</u>, <u>supra</u>, 426 F.3d at 607.
Finally, the nature of the rule in issue also impacts the assess-
ment of the reasonableness of the state court's action.

> [W]hile very specific rules may not permit much leeway
> in their interpretation, the same is not true of more
> general rules, the meaning of which "must emerge in
> application over the course of time." [<u>Yarborough v.
> Alvarado</u>, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004)].
> "The more general the rule, the more leeway courts have
> in reaching outcomes in case by case determinations."
> <u>Id</u>.

<u>Serrano v. Fischer</u>, <u>supra</u>, 412 F.3d at 297.

Both the "contrary to" and "unreasonable application"
clauses "restrict[] the source of clearly established law to [the
Supreme] Court's jurisprudence." <u>Williams v. Taylor</u>, <u>supra</u>, 529
U.S. at 412. "That federal law, as defined by the Supreme Court,
may either be a generalized standard enunciated in the [Supreme]
Court's case law or a bright-line rule designed to effectuate
such a standard in a particular context." <u>Kennaugh v. Miller</u>,
289 F.3d 36, 42 (2d Cir. 2002). "A petitioner cannot win habeas

13

relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d 104, 109 (2d Cir. 2003); accord DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

In order to be entitled to the deferential standard of review, the state courts must have resolved a petitioner's claims "on the merits." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003). "A state court adjudicates a claim 'on the merits' for purposes of § 2254(d) when it '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment . . . . even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.'" Serrano v. Fischer, supra, 412 F.3d at 296, quoting Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004). A state court's summary statement that a claim is "without merit," without further explanation, constitutes an adjudication on the merits for purposes of § 2254(d). Serrano v. Fischer, supra, 412 F.3d at 296; see Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005).

When the state court has not resolved a habeas petitioner's claim on the merits, the state court's decision is subject to de novo review. Cotto v. Herbert, supra, 331 F.3d at 230; Diaz v. Herbert, 317 F. Supp.2d 462, 470 (S.D.N.Y. 2004).

On direct appeal, the Appellate Division reached the merits of petitioner's claims and concluded that "[trial] counsel

provided meaningful representation." People v. Paulino, supra, 287 A.D.2d at 302, 731 N.Y.S.2d at 152. Petitioner's application for leave to apply for a writ of error coram nobis, which raised the ineffective assistance of appellate counsel claim, was denied without opinion. People v. Paulino, supra, 301 A.D.2d at 1024, 755 N.Y.S.2d at 691. I consider this to be an adjudication on the merits since there was no indication "that the claim[ was] decided on anything but substantive grounds." Sellan v. Kuhlman, supra, 261 F.3d at 314.

Although it appears that petitioner's ineffective assistance claims were resolved on the merits, it is less clear whether petitioner's Vienna Convention claim was decided on the merits because the Appellate Divisions's opinion expressly addressed only the arguments raised in petitioner's counsel's brief, not in petitioner's pro se brief. People v. Paulino, supra, 287 A.D.2d at 302, 731 N.Y.S.2d at 152. However, I need not resolve what standard of review should be applied to petitioner's Vienna Convention claim because, as explained below, the claim is meritless even under de novo review. See Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001) (determination of appropriate standard of review is unnecessary when claim fails under any potentially applicable standard).

B.  Ineffective Assistance
    of Counsel Claims

1.  Trial Counsel's
    Failure to Re-Cross
    Examine Angelica

Petitioner claims that he received ineffective assistance of both trial and appellate counsel.  Petitioner claims his trial counsel was ineffective because counsel failed to re-cross examine Angelica.

On re-direct, Angelica testified that she saw a ladder placed on the interior of and "across" the front door of her apartment (Tr. at 342).  Petitioner claims that because this testimony concerning the position of the ladder was the "cornerstone" of his conviction for unlawful imprisonment in the first degree, his counsel's failure to re-cross examine Angelica about the ladder constituted ineffective assistance of counsel (Pet. Memo. at 3).

Respondents argue that petitioner's ineffective assistance of counsel claims are without merit because trial counsel's strategic decision not to re-cross examine Angelica does not support an ineffective-assistance claim (Resp. Memo. at 15-19).

In order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must meet the now-familiar two-part test set forth in Strickland v. Washington, 466 U.S. 668, 686-87 (1984):

The benchmark for judging any claim of ineffec-
tiveness must be whether counsel's conduct so under-
mined the proper functioning of the adversarial process
that the trial cannot be relied on as having produced a
just result.

. . . .

A convicted defendant's claim that counsel's
assistance was so defective as to require reversal of a
conviction . . . has two components.  First, the defen-
dant must show that counsel's performance was defi-
cient.  This requires showing that counsel made errors
so serious that counsel was not functioning as "coun-
sel" guaranteed by the Sixth Amendment.  Second, the
defendant must show that the deficient performance
prejudiced the defense.  This requires showing that
counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is
reliable.  Unless a defendant makes both showings, it
cannot be said that the conviction . . . resulted from
a breakdown in the adversary process that renders the
result unreliable.

Accord <u>Davis v. Greiner</u>, 428 F.3d 81, 87 (2d Cir. 2005); <u>Greiner</u>

<u>v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005); <u>Aeid v. Bennett</u>, 296

F.3d 58, 62-63 (2d Cir. 2002); <u>Hernandez v. United States</u>, 202

F.3d 486, 488 (2d Cir. 2000); <u>Guerrero v. United States</u>, 186 F.3d

275, 281-82 (2d Cir. 1999); <u>McKee v. United States</u>, 167 F.3d 103,

106-07 (2d Cir. 1999); <u>Jackson v. Leonardo</u>, 162 F.3d 81, 85 (2d

Cir. 1998).

In determining whether counsel's performance was

objectively deficient, courts "must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the [petitioner] must overcome

the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." <u>Strickland v.</u>
<u>Washington</u>, <u>supra</u>, 466 U.S. at 689 (internal quotation marks
omitted).

The second prong of the test -- actual prejudice --
requires that the petitioner show that, but for trial counsel's
errors, there is a "reasonable probability" that the result of
the trial would have been different.  "A reasonable probability
is a probability sufficient to undermine confidence in the
outcome."  <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at 694.

The decision whether to cross-examine at all, and if so
the extent of the cross-examination, is generally a strategic
decision reserved for counsel and will not usually support an
ineffective-assistance claim.  <u>United States v. Luciano</u>, 158 F.3d
655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-
examination is entrusted to the judgment of the lawyer, and an
appellate court on a cold record should not second-guess such
decisions unless there is no strategic or tactical justification
for the course taken."); <u>Dunham v. Travis</u>, 313 F.3d 724, 732 (2d
Cir. 2002) ("Decisions about 'whether to engage in cross-examina-
tion, and if so to what extent and in what manner, are . . .
strategic in nature' and generally will not support an ineffec-
tive assistance of counsel claim."), <u>quoting</u> <u>United States v.</u>
<u>Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987).

However, counsel's decision not to cross-examine a witness or pursue a particular line of questioning may constitute ineffective assistance where, for example, counsel fails to examine inconsistencies in witnesses' stories that are of "enormous value" to the defense, Eze v. Senkowski, 321 F.3d 110, 132-33 (2d Cir. 2003), counsel fails to confront a victim with a prior inconsistent statement that impugns the credibility of her version of the events, Harris v. Senkowski, 298 F. Supp.2d 320, 337-39 (E.D.N.Y. 2004), or counsel fails to confront a witness with evidence that contradicts her testimony, Harris v. Artuz, 288 F. Supp.2d 247, 259-60 (E.D.N.Y. 2003).

Turning to the first prong of Strickland -- whether counsel's performance was objectively deficient -- petitioner has not shown why trial counsel's decision not to re-cross examine Angelica was deficient in any respect. Petitioner has not cited any evidence or other information counsel could have used to impugn Angelica's credibility or the accuracy of her testimony. There is no evidence of prior inconsistent statements, an impaired ability to observe or any other factor that would have impeached Angelica. Under these circumstances, re-cross examination would have created a risk that Anglica would merely repeat the damaging testimony she gave on re-direct examination and may have created a vehicle for her to clarify her vague statement that the ladder was "across" the door. See Fu v. Costello, 03

Civ. 5746 (LAK)(GWG), 2004 WL 2053254 at *15 (S.D.N.Y. Sept. 14, 2004) (rejecting ineffective-assistance claim where counsel did not cross-examine witness because there was no evidence contradicting the witness's statement).  Thus, it appears that counsel's decision not to re-cross examine Angelica was reasonable and should not be second-guessed here.

The second prong of Strickland requires that petitioner be prejudiced by counsel's unreasonably deficient performance. Assuming arguendo that petitioner's counsel was unreasonably deficient, petitioner's claim fails because he has not shown that he was prejudiced by Angelica's testimony on re-direct and there is no evidence that re-cross examining her would have refuted her testimony.

Petitioner claims that Angelica's testimony regarding the ladder blocking the door was the "cornerstone" of his conviction for unlawful imprisonment (Pet. Memo. at 3).  This contention is erroneous.  First, petitioner could have been convicted regardless of whether the ladder was blocking the door because Angelica's testimony established that he prohibited her movements by threat of force.  New York Penal Law Section 135.10 states that a "person is guilty of unlawful imprisonment in the first degree when he restrains another person under circumstances which expose the latter to a risk of serious physical injury."  In this case, petitioner restrained Angelica by threatening to kill her,

telling her that if she moved he would cut off her hands and by exposing her to serious injury by swinging a machete in close proximity to her.  See People v. Vasquez, 191 A.D.2d 659, 659-60, 595 N.Y.S.2d 223, 224 (2d Dep't 1993) (affirming unlawful imprisonment conviction where a machete was used to intimidate and threaten a victim confined in a vehicle); People v. Parham, 156 A.D.2d 946, 946, 551 N.Y.S.2d 703, 703 (4th Dep't 1989) (affirming unlawful imprisonment conviction of defendant who bound, gagged and further threatened victim).  Although creating physical boundaries that entrap is evidence of wrongful imprisonment, a reasonable jury still could have found petitioner guilty of wrongful imprisonment for restricting Angelica's movements by swinging a machete near her and making threatening remarks regardless of whether petitioner barricaded the front door to the apartment.

Second, as stated above, petitioner has presented no evidence refuting Angelica's statement that petitioner barricaded the front door with the ladder.  He merely claims that counsel should have re-cross examined her without stating what purpose re-cross examination would have served.

Thus, because petitioner could have been convicted of unlawful imprisonment without the testimony about the ladder and has not presented any evidence suggesting how re-cross examination of Angelica would have helped his defense, petitioner has

failed to show how he was prejudiced by counsel's decision to not re-cross examine Angelica.

Because petitioner's counsel's decision to not re-cross examine Angelica was a reasonable trial strategy and petitioner was not prejudiced by counsel's failure to re-cross examine Angelica, petitioner's ineffective assistance of counsel claim based on counsel's decision not to re-cross examine Angelica should be denied.

2.  Violation of Sixth Amendment
    Confrontation Clause Claim[5]

Petitioner's claim that his counsel's failure to re-
cross examine Angelica violated his Sixth Amendment right under
the confrontation clause is misplaced.  A criminal defendant has
a constitutional right to confront his accuser, which includes a
right to cross-examine the accuser.  See Douglas v. Alabama, 380
U.S. 415, 418 (1965) ("[A] primary interest secured by [the
Confrontation Clause] is the right of cross-examination.");  Cotto
v. Herbert, supra, 331 F.3d at 248-49 ("The Confrontation Clause

---

[5]Petitioner argues that his counsel's ineffective assistance
amounted to a violation of petitioner's due process and equal
protection rights (Pet. Memo. at 7-8).  This arguments is
meritless.  To the extent petitioner raises a substantive due
process claim, the claim must fail because the Sixth Amendment
requires criminal defendants to receive effective assistance of
counsel and "[w]here a particular Amendment 'provides an explicit
textual source of constitutional protection' against a particular
sort of government behavior, 'that Amendment, not the more
generalized notion of "substantive due process," must be the
guide for analyzing these claims.'"  Albright v. Oliver, 510 U.S.
266, 273 (1994), quoting Graham v. Connor, 490 U.S. 386, 395
(1989).  To the extent petitioner argues that there is a
procedural due process right to effective assistance of counsel
beyond the provisions of the Sixth Amendment, petitioner cites no
authority, nor am I aware of any such authority, that holds such
a right exists for a criminal defendant.  Petitioner's equal
protection claim also fails because, even assuming he received
ineffective assistance, petitioner does not assert that he was
treated differently on the basis of his membership in an
identifiable or suspect class.  Jackson v. Mann, 196 F.3d 316,
320 (2d Cir. 1999); Giano v. Senkowski, 54 F.3d 1050, 1057 (2d
Cir. 1995); Danielak v. City of New York, 02-CV-2349 (KAM), 2005
WL 2347095 at *12 (E.D.N.Y. Sept. 26, 2005); Guzman v. Couture,
99 Civ. 11316 (RMB)(HBP), 2003 WL 165746 at *12 (S.D.N.Y. Jan.
22, 2003) (adopting report and recommendation); Grandal v. City
of New York, 966 F. Supp. 197, 203 (S.D.N.Y. 1997).

is violated when a defendant is 'prohibited from engaging in otherwise appropriate cross-examination designed . . . to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (additional internal quotation marks omitted)), quoting Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); see also Morales v. Artuz, 281 F.3d 55, 59 (2d Cir. 2002) (noting the Supreme Court's varying rationales concerning the rights under the confrontation clause includes the right to cross-examine and confront one's accuser face-to-face).

Petitioner was not denied the right to confront Angelica. Petitioner's counsel made a strategic decision not to re-cross examine Angelica that did not violate petitioner's right to confrontation; that right was initially exercised on cross and then voluntarily waived after re-direct (Tr. at 310-38, 342). Therefore, petitioner's Sixth Amendment claim should be denied.

### 3. Appellate Counsel's Failure to Appeal Particular Issues

Petitioner also claims that his appellate counsel was ineffective for raising weaker arguments instead of the issues addressed above, namely, that (1) trial counsel was ineffective by not re-cross examining Angelica, (2) counsel's decision not to re-cross Angelica was a violation of petitioner's Fifth, Sixth and Fourteenth Amendments rights and (3) petitioner's right to

24

consult with his consulate under the Vienna Convention was violated (Pet. Memo. at 19-21; Petitioner's Memorandum of Law in Opposition to [Respondents'] Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus ("Pet. Reply"), Docket Item 18, at 27).  Respondents argue that petitioner's appellate counsel appropriately raised other arguments on appeal rather than those submitted by petitioner in his pro se brief (Resp. Memo. at 19-21).

The same Strickland standards discussed above also apply to claims of ineffective assistance of appellate counsel. Mercer v. Herbert, 133 F. Supp.2d 219, 238 (W.D.N.Y. 2001) ("A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel."); see also Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); Hernandez v. Edwards, 98 Civ. 6704 (MBM), 2001 WL 575594 at *4 (S.D.N.Y. May 29, 2001).  In the appellate context, "it does not suffice 'for the habeas petitioner to show merely that counsel omitted a non frivolous argument.'"  McKee v. United States, supra, 167 F.3d at 106, quoting Mayo v. Henderson, supra, 13 F.3d at 533.  "Rather, it is the hallmark of effective appellate advocacy to choose wisely which claims are brought on appeal." Fletcher v. Mann, 956 F. Supp. 168, 173 (N.D.N.Y. 1997), aff'd mem., 165 F.3d 13 (2d Cir. 1998) (internal quotation marks omitted).  Thus,

> [i]n assessing the reasonableness of the arguments
> posed on appeal versus other possible nonfrivolous
> arguments, the district court must examine the trial
> court record to determine whether appellate counsel
> failed to present significant and obvious issues on
> appeal. . . . Generally, only when ignored issues "are
> clearly stronger than those presented, will the pre-
> sumption of effective assistance of counsel be over-
> come."

Larrabee v. Smith, 14 F. Supp.2d 235, 239 (N.D.N.Y. 1998),

quoting Mayo v. Henderson, supra, 13 F.3d at 533; see Torres v.

Irvin, 33 F. Supp.2d 257, 266 (S.D.N.Y. 1998).

As discussed above and in the following section,

petitioner's claims for ineffective assistance of trial counsel,

and violations of his Fifth, Sixth and Fourteenth Amendments and

Vienna Convention rights are meritless and, thus, appellate

counsel's decision not to assert them is not ineffective assis-

tance. Aparicio v. Artuz, supra, 269 F.3d at 99 ("[Counsel's]

failure to [assert] a meritless argument does not fall outside

the wide range of professionally competent assistance to which

Petitioner was entitled." (internal quotation omitted)); Lilly v.

Gilmore, 988 F.2d 783, 786 (7th Cir. 1993) ("The Sixth Amendment

does not require [appellate] counsel . . . to press meritless

arguments before a court."); Lu v. Phillips, 03-CV-2258 (RJD),

2005 WL 1889461 at *3 (E.D.N.Y. Aug. 4, 2005) (finding appellate

counsel's failure to raise defaulted and meritless arguments was

not ineffective assistance); Ehinger v. Miller, 942 F. Supp. 925,

928 (S.D.N.Y. 1996) (failure of counsel to make "losing argument"

cannot be found to be ineffective assistance).  Thus, I find
petitioner's claim for ineffective assistance of appellate
counsel to be meritless.

C.  Vienna Convention Claim

Petitioner's final claim is that his rights under the
Vienna Convention on Consular Relations were violated when the
arresting officers and/or the District Attorney's Office failed
to inform him of his rights under the Convention to consult or
communicate with a consular official from the Dominican Republic,
his country of origin (Pet. Memo. at 8-12; Pet. Reply at 22).
Petitioner alleges that had he been permitted to communicate with
the Consulate of the Dominican Republic, consular officials would
have prevented the prosecutrix and local police from threatening
his relatives and forcing them to testify dishonestly against
him, "arrang[ed] his defense," and "help[ed] his family in
understanding the New York and United States justice system"
(Pet. Reply. at 22).  Other than his conclusory and unsupported
statement, petitioner offers no evidence that the consular
officials of the Dominican Republic would, in fact, have done
anything if notified of petitioner's arrest.

Respondents argue that petitioner cannot obtain relief
under the Vienna Convention because there was no clearly estab-
lished right of individual redress under the Convention at the

time of petitioner's arrest and <u>Teague v. Lane</u>, 489 U.S. 288

(1989), prohibits this court from newly creating such a right on

habeas review.  Respondents further argue that even if the police

failed to inform him of his right under the Convention, peti-

tioner was not prejudiced by the alleged failure (Resp. Memo. at

10-15).

Article 36 of the Vienna Convention provides:

1.  With a view to facilitating the exercise of
consular functions relating to nationals of the sending
State[6]:

(a) consular officers shall be free to commu-
nicate with nationals of the sending State and to
have access to them.  Nationals of the sending
State shall have the same freedom with respect to
communication with and access to consular officers
of the sending State;

(b) if he so requests, the competent authori-
ties of the receiving State shall, without delay,
inform the consular post of the sending State if,
within its consular district, a national of that
State is arrested or committed to prison or to
custody pending trial or is detained in any other
manner.  Any communication addressed to the con-
sular post by the person arrested, in prison,
custody or detention shall also be forwarded by
the said authorities without delay.  The said
authorities shall inform the person concerned
without delay of his rights under this sub-para-
graph;

---

[6]"Under the language of the [Vienna Convention], the
'sending State' is the nation of the arrested foreign national,
and the 'receiving State' is the arresting nation."  <u>United
States v. Emuegbunam</u>, 268 F.3d 377, 388 n.3 (6th Cir. 2001),
<u>citing</u> <u>United States v. Chaparro-Alcantara</u>, 226 F.3d 616, 620 n.1
(7th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 1026 (2000).

> (c) consular officers shall have the right to
> visit a national of the sending State who is in
> prison, custody or detention, to converse and
> correspond with him and to arrange for his legal
> representation.  They shall also have the right to
> visit any national of the sending State who is in
> prison, custody or detention in their district in
> pursuance of a judgment.  Nevertheless, consular
> officers shall refrain from taking action on be-
> half of a national who is in prison, custody or
> detention if he expressly opposes such action.
>
> 2.  The rights referred to in paragraph 1 of this
> Article shall be exercised in conformity with the laws
> and regulations of the receiving State, subject to the
> proviso, however, that the said laws and regulations
> must enable full effect to be given to the purposes for
> which the rights accorded under this Article are in-
> tended.

Vienna Convention on Consular Relations and Optional Protocol on

Disputes ("Vienna Convention"), April 24, 1963, 21 U.S.T. 77,

T.I.A.S. No. 6820, 1969 WL 97928.

Petitioner's Vienna Convention claim suffers from a

number of defects, some of which are raised by respondents, and

some of which have been identified in cases discussing the

Convention that have been decided after the parties submitted

their papers.

First, as of the date of petitioner's arrest in 1998,

there was no "clearly established Federal law, as determined by

the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),

establishing that the Vienna Convention created individual rights

in addition to the rights conveyed to the signatory countries.

Approximately one month after petitioner's arrest, the Supreme

Court noted that it was only "arguabl[e]" that the Convention created individual rights. <u>Breard v. Greene</u>, 523 U.S. 371, 376 (1998). In the almost-eight years since petitioner's arrest, the Supreme Court has not had occasion to resolve the issue. <u>See</u> <u>Medellin v. Dretke</u>, 125 S.Ct. 2088 (2005) (<u>per curiam</u>) (noting that the International Court of Justice has determined that the Vienna Convention guarantees individually enforceable rights but neither accepting nor rejecting that conclusion). Thus, even if I assume the truth of petitioner's contention that he was not advised of his Vienna Convention "rights," he has not shown that there was a violation of any "clearly established federal law, as determined by the Supreme Court of the United States."

Second, even if the Vienna Convention does give rise to individually enforceable rights, no such rights were clearly established in 1998 and applying such rights at this time would violate the prohibition set forth in <u>Teague v. Lane</u>, 489 U.S. 288 (1989).

As explained recently by the Court of Appeals for the Second Circuit:

> A federal habeas corpus court normally may not apply a "new rule" within the meaning of <u>Teague</u> to upset a state court conviction. <u>See</u> <u>O'Dell v. Netherland</u>, 521 U.S. 151, 156-57, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997); <u>Lambrix v. Singletary</u>, 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); <u>Teague</u>, 489 U.S. at 310, 109 S.Ct. 1060. A rule is "new" within the meaning of <u>Teague</u> "if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '<u>dictated</u> by precedent existing at

the time the defendant's conviction became final.'"
Graham v. Collins, 506 U.S. 461, 467, 113 S.Ct. 892,
122 L.Ed.2d 260 (1993) (quoting Teague, 489 U.S. at
301, 109 S.Ct. 1060) (emphasis in original).  There are
two limited exceptions to Teague.  The first applies to
new rules "forbidding criminal punishment of certain
primary conduct" or "prohibiting a certain category of
punishment for a class of defendants because of their
status or offense."  See O'Dell, 521 U.S. at 157, 117
S.Ct. 1969 (quoting Penry v. Lynaugh, 492 U.S. 302,
330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), abrogated
on other grounds, Atkins v. Virginia, 536 U.S. 304,
306, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).  The
second applies to "'watershed rules of criminal proce-
dure implicating the fundamental fairness and accuracy
of the criminal proceeding.'"  O'Dell, 521 U.S. at 157,
117 S.Ct. 1969 (quoting Graham, 506 U.S. at 478, 113
S.Ct. 892 (quoting Saffle v. Parks, 494 U.S. 484, 495,
110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), and Teague, 489
U.S. at 311, 109 S.Ct. 1060)).

Hernandez v. Greiner, 414 F.3d 266, 270 (2d Cir. 2005).  A

finding that a violation of the consular notice provisions of the

Vienna Convention invalidates a state criminal conviction would

constitute a new rule that does not fit within either of Teague's

recognized exceptions.  United States v. Emuegbunam, supra, 268

F.3d 377, 393; Flores v. Johnson, 210 F.3d 456, 457-58 (5th Cir.

2000).

    Third, even if the Vienna Convention creates individual

rights and a claim is not prohibited by Teague, a violation of

those rights will provide a basis for habeas relief only if they

resulted in a fundamental defect in petitioner's trial.  As the

Supreme Court recently noted:

        [A] violation of [the Vienna Convention's consular
        access] provisions may not be cognizable in a federal
        habeas proceeding.  In Reed v. Farley, 512 U.S. 339,

31

> 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994), this Court
> recognized that a violation of federal statutory rights
> ranked among the "nonconstitutional lapses we have held
> not cognizable in a postconviction proceeding" unless
> they meet the "fundamental defect" test announced in
> our decision in Hill v. United States, 368 U.S. 424,
> 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). 512 U.S., at
> 349, 114 S.Ct. 2291 (plurality opinion); see also id.,
> at 355-356, 114 S.Ct. 2291 (SCALIA, J., concurring in
> part and concurring in judgment).

Medellin v. Dretke, supra, 125 S.Ct. at 2090-91; see also Waldron v. Immigration & Naturalization Serv., 17 F.3d 511, 518-19 (2d Cir. 1993) (holding that because the Vienna Convention's right to consult is not a fundamental right, such as the right to counsel, a challenged proceeding where that right was violated should only be invalidated upon a showing of prejudice); Hernandez v. United States, 280 F. Supp.2d 118, 124 (S.D.N.Y. 2003) ("[A] violation of the Vienna Convention does not provide a defendant in a criminal case with the right to any relief unless the defendant can establish prejudice as a result of the violation." (citations omitted)); Akosa v. United States, 219 F. Supp.2d 311, 314-15 (E.D.N.Y. 2002) (denying writ of habeas based on Vienna Convention violation where the result of petitioner's trial would not have been different had the treaty not been violated).

Petitioner claims that had he and his family been able to consult with Dominican consular officials, the police and the prosecutrix handling the case would not have been able to use threats to compel Angelica to give false testimony against petitioner. In connection with this claim, Petitioner has

submitted a declaration from Angelica, made under penalty of perjury pursuant to 28 U.S.C. § 1746, in which she states that petitioner did not swing the machete at her or threaten to kill her, but that she testified he engaged in such conduct only as a result of threats from the police and the prosecutrix. Specifically, Angelica stated in her declaration:

> 6. At no particular time did Jose stated [sic] that he was going to kill [sic] or make me see how it feel[s] to be trapped. I was instructed by the 33rd Precinct Police officers, Officer Tullio, and by [sic] Assistant District Attorney to testify, in front of the Gran[d] Jury, that Jose said he was going to make me see how it feel[s] to be trapped, and that he was going to kill me. Jose never said any of that to me.

> 7. Further, I was instructed by Assistant District Attorney Diana Logan to testify that Jose swung the machete at me, and that he hit [the] bed-side table twice and that he further hit the mirror. I can today say that Jose only swung the machete once, and that's when he hit the bed-side table to cut off the phone cord to interrupt my communication with the 9-11 operator.

> . . . .

> 11. Further, it is my statement that the 33rd Precinct police officers, among officer Tullio [sic], came to my place of residence, at 145 Audobon Avenue, Apt. 4D, New York, New York [o]n several occasions to harass and threaten me to testify in Court against Jose as they and District Attorney Diana Logan have already instructed me to testify in front of the grand jury, or otherwise I would be sent to prison.

> 12. I was further harass[ed] and threatened by Assistant District Attorney Diana Logan with prison time if I refuse[d] to testify against Jose as she ha[d] instructed me to testify in front of the jury during Jose's trial.

(Declaration of Angelica Paulino, dated January 16, 2004, ¶¶ 6-7, 11-12).

Assuming, without deciding, that Angelica did testify falsely against petitioner, and further assuming that such false testimony constitutes a "fundamental defect," petitioner has failed to offer evidence sufficient to show that the defect was caused by the putative violation of the Vienna Convention.

Article 36 of the Vienna Convention does not obligate a Sending State to do anything. After being notified of the arrest of one of its nationals, or even receiving a request for assistance from an individual, the Sending State is free to do nothing. Petitioner here has not submitted any evidence to show what, if anything, the Consulate of the Dominican Republic would have done in 1998 had it received a request for assistance from petitioner, nor has he shown what, if anything, the Consulate would have done if it had received a request from Angelica concerning the prosecutrix's alleged coercion. Furthermore, even if petitioner had shown that the Consulate would have intervened, there is no evidence that the Consulate could have prevented the alleged coercion; a Dominican consular official would not have had the power to immunize Angelica from the prosecutrix's subpoena power, see generally N.Y. Crim. Proc. L. § 610.10(1), nor would such an official have been able to bar the police and prosecutrix from speaking to Angelica. In the absence of evi-

dence showing what the Dominican Consulate could have or would have done, there is nothing that connects the allegedly "fundamental defect" to the alleged violation of the Vienna Convention. Since petitioner bears the burden of proof in this proceeding, this lack of evidence is fatal to his claim. See generally Hawk v. Olson, 326 U.S. 271, 279 (1945) ("Petitioner carries the burden in a collateral attack on a judgment."); accord Galarza v. Keane, 252 F.3d 630, 636-37 n.5 (2d Cir. 2001) (habeas petitioner "has the burden of demonstrating his habeas claims by a preponderance of the evidence"); Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994); Pinkney v. Keane, 920 F.2d 1090, 1094 (2d Cir. 1990) ("[T]he petitioner generally bears the burden of proof throughout the habeas proceeding."); Harned v. Henderson, 588 F.2d 12, 22 (2d Cir. 1978) ("It is, of course, well settled that in federal habeas corpus proceedings the burden of proving a constitutional claim lies with the petitioner and that the nature of that burden is the customary civil one of a preponderance of the evidence.").[7]

---

[7]I do not address petitioner's claim that perjured testimony was offered against him because he has never asserted it as an independent claim. Without doubt, a criminal conviction based on the prosecution's deliberate use of perjured testimony is a profoundly serious deprivation of Due Process. The Supreme Court has noted that where "a state, whether by the active conduct or the connivance of the prosecution, obtains a conviction through the use of perjured testimony, it violates civilized standards for the trial of guilt or innocence and thereby deprives an accused of liberty without due process of law." Hysler v.
(continued...)

Thus, petitioner's claim arising out of the alleged violation of the Vienna Convention also fails.

IV. Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that petitioner's petition for a writ of habeas corpus be denied because all claims asserted are without merit.

In addition, since petitioner has not made a substantial showing of the denial of a constitutional right, I also recommend that a certificate of appealability not be issued.  28 U.S.C. § 2253; see also United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997).

I further recommend that certification pursuant to 28 U.S.C. § 1915(a)(3) not be issued because any appeal from this Report and Recommendation, or any Order entered thereon, would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).

---

[7](...continued)
Florida, 315 U.S. 411, 413 (1942), citing Mooney v. Holohan, 294 U.S. 103, 112 (1935).  I cannot, however, "construe" the petition to assert a claim that simply is not there.

Moreover, petitioner never asserted any claim in state court that he was convicted on false testimony.  Accordingly, even if it were possible to somehow read such a claim into the petition, the exhaustion requirement would prevent me from granting any relief on such a claim.

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections.  See also Fed.R.Civ.P. 6(a) and 6(e).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, United States District Judge, 500 Pearl Street, Room 2510, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Batts.  FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir.

1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         January 4, 2006

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Mr. Jose E. Paulino
EPS F-1503
P.O. Box 02-5301
Miami, Florida 33102

Luke Martland, Esq.
Assistant Attorney General
Attorney General of the State of New York
Habeas Litigation Section
Criminal Division
120 Broadway, 22nd Floor
New York, New York 10271